# UNITED STATES DISTRICT COURT
# DISTRICT OF NEVADA

| | |
|---|---|
| UNITED STATES OF AMERICA,            )<br>                                                             )<br>              Plaintiff,                              )<br>                                                             )<br> vs.                                                      )<br>                                                             )<br>ERIC SHEVA MANTEL BRANCH, and )<br>MICHAEL D. WILLIAMS,                  )<br>                                                             )<br>              Defendants.                         )<br>_____ ) | 2:12-cr-00274-JCM-GWF<br><br>**ORDER**<br><br>**Sealed Motion to Sever (#26)** |

This matter is before the Court on Defendant Eric Sheva Mantel Branch's Sealed Motion to Sever (#26), filed on February 11, 2013; the Government's Response to Defendant's Motion to Sever (#30), filed on March 11, 2013; and Defendant's Sealed Reply to the Government's Response (#32), filed on March 25, 2013.  The Court conducted a hearing in this matter on April 1, 2013.

## BACKGROUND

The indictment in this case charges Defendants Eric Sheva Mantel Branch and Michael D. Williams with having conspired to create a fraudulent individual or identity, "William Reed," to purchase a condominium unit.  Defendant Branch allegedly acted as the real estate agent for Reed and negotiated the terms of the purchase, which included an illegal kick-back payment to Defendant Williams.  *Indictment (#1), Count One,* ¶ 2.  The indictment further alleges that Defendants Branch and Williams, and their co-conspirators, created loan applications and supporting documents that contained false information about William Reed's identity, income, intent to occupy the property, and assets. ¶4.  The indictment further alleges that the sellers wired approximately $104,000 to the bank account of Defendant Williams' company, KMKM Financial,

which Williams then laundered through other accounts set up in the names of "Terry Jones" and "William Reed." ¶¶ 8-12. Count One of the indictment charges Branch and Williams with conspiracy to commit bank, mail and wire fraud in violation of 18 U.S.C. §1349. Count Two charges them with bank fraud in violation of 18 U.S.C. §1344. Defendant Williams is charged in Counts Three, Four and Five with money laundering in violation of 18 U.S.C. §§1956(a)(1)(B)(i) and 2.

      The Government summarizes its case against the Defendants as follows: Branch and Williams had worked together previously on other real estate transactions. Branch was an experienced real estate agent and Williams recruited investors to purchase real estate in Las Vegas. In the charged transaction, Williams, working with others, created the false identity of William Reed. Branch then negotiated the purchase of the condominium on behalf of Reed, including a kick-back from the sellers. Branch and an unindicted co-conspirator prepared the purchase agreement and the addendum which provided for the kick-back from the sellers. Branch had direct conversations with the sellers and, when the sellers were initially reluctant to agree to the kick-back payment, Branch, Williams and others threatened to physically harm them and their real estate agent. After the purchase agreement and addendum were executed, the sellers' real estate agent took the documents to an escrow officer who advised the agent that the addendum was not legal. *Government's Response (#30), pg. 2.* The Government also alleges that Branch deposited $40,000 into an account in the name of Reed to create the appearance that Reed existed and had "seasoned funds." Branch and Williams submitted false mortgage loan applications to Countrywide Bank which resulted in the loan being funded and closed. Branch and Williams then told the sellers that the kick-back had to be paid outside of escrow. When the sellers failed to pay the full amount promptly, Branch and Williams threatened them with physical harm. The Government states that "Williams then, apparently, stole the kick-back from his co-conspirator Defendant Branch and laundered the funds through several bank accounts." *Government's Response (#30), pg. 3.*

      Defendant Branch moves to sever his trial from that of Co-Defendant Williams on the grounds that a joint trial would result in unfair prejudice to him. Mr. Branch's motion is based on the statements that Williams allegedly made to investigating FBI agents on April 18, 2011 and May

31, 2011 which are summarized in the FBI "302" reports attached to Defendant Branch's motion. *Sealed Motion (#26), Exhibits "A"* and *"B."* Williams allegedly told the agents that he found William Reed through a search on Craigslist and that his only contact with Reed was over the telephone and through email messages. Williams told the agents that he did not know Reed's identity was fictitious and denied creating any false documents. Williams also allegedly told the agents that Branch informed him that the sellers were willing to make cash back payment to the buyer. Williams stated that this was the first time he had ever heard of a cash back deal and he did not know that it was illegal. Williams denied having any involvement in structuring the cash back deal. Williams stated that Branch arranged for the cash-back funds to be paid to KMKM Financial's bank account. Branch was supposed to receive back the $40,000 that he put into Reed's bank account, plus an additional $20,000 from Reed. Although Williams was only entitled to take his "bird-dog" fee, he did not pay Branch his share of the cash back proceeds that were deposited into KMKM Financial's bank account.

## DISCUSSION

Rule 8(b) of the Federal Rule of Criminal Procedure permits the joinder of defendants who have allegedly participated in the same act or transaction or the same series of acts or transactions constituting an offense or offenses. Joinder is generally favored because it promotes efficiency. Rule 14 provides that the trials may be severed, however, when it is apparent that a joint trial would cause prejudice. "The Supreme Court has held that 'when defendants have been properly joined under Rule 8(b), a district court should grant severance under Rule 14 only if there is serious risk that a joint trial would prejudice a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence.'" *United States v. Mayfield*, 189 F.3d 895, 899 (9th Cir. 1999), citing *Zafiro v. United States*, 506 U.S. 534, 539, 113 S.Ct. 933 (1993). *See also United States v. Stinson*, 647 F.3d 1196, 1205 (9th Cir. 2011).

   I.   **Severance Based on *Bruton v. United States*.**

Defendant Branch argues that pursuant to *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620 (1968), he will be unfairly prejudiced by the introduction of Defendant Williams' statements to FBI agents during a joint trial before the same jury. Branch argues that there is no way to redact

or edit Defendant Williams' statements to eliminate those portions that implicate him in the alleged crimes. *See Richardson v. Marsh*, 481 U.S. 200, 107 S.Ct. 1702 (1987) (defendant was not prejudiced by co-defendant's confession which was redacted to omit all reference to the defendant and all indication that anyone other than the co-defendant and a third person had committed the crime); *compare Gray v. Maryland*, 523 U.S. 185, 118 S.Ct. 1151 (1998) (the redaction of the defendant's name from the co-defendant's confession did not avoid the Sixth Amendment violation because the confession still provided a direct inference that the defendant was the other individual involved in the crime). The Government concedes that Defendant Williams' statements to the FBI agents cannot be redacted or edited to avoid a violation of Defendant Branch's Sixth Amendment rights. The Government argues, however, that instead of complete severance, the Court should impanel separate juries for each defendant in a joint trial.

The Government relies on the Ninth Circuit's en banc decision in *Lambert v. Stewart*, 191 F.3d 1181 (9th Cir. 1999) which held that the defendant's Sixth Amendment rights were not violated where the trial court impaneled two juries in a murder trial to separately consider evidence against each defendant which could not be introduced during a joint trial before a single jury. The court stated that "dual juries are in wide use and [] they have worked out just fine. In fact, we have accepted the use of dual juries in noncapital cases. (citations omitted)." 191 F.3d at 1185. The court noted that despite the dangers of prejudice, the Supreme Court has lauded the benefits of joint trials which "'promote efficiency and serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts.'" *Id.* at 1186. The court further stated: "We are satisfied that the use of dual juries can actually palliate, rather than exacerbate, the risks of a joint trial. Particularly in a case like this one, where the main reason for a severance was one specific class of evidence, the use of dual juries can capture both the advantages of a joint trial and the protections of separate trials." *Id.*

In *Wilson v. Sirmons*, 536 F.3d 1064, 1099 (10th Cir. 2008), the Tenth Circuit also rejected the defendant's argument that he was unfairly prejudiced by the use of dual juries in his capital murder case. In so holding, the Court stated:

. . .

4

> The dual jury procedure is not without problems. Dual jury trials require counsel to guard against prejudicial evidence that might be entered against another defendant, drawing the lawyer's attention away from his own client. This increases the already difficult job of the capital defense lawyer. Additionally, constantly removing a jury from the room interrupts the flow of trial and can confuse the jury. Jury management difficulties increase two-fold. *Scarborough v. State,* 50 Md.App. 276, 437 A.2d 672, 674–75 (Spec.App. 1981); *see also United States v. Rimar,* 558 F.2d 1271, 1273 (6th Cir. 1977); *State v. Corsi,* 86 N.J. 172, 430 A.2d 210, 213 (1981) ("[T]he multiple jury procedure ... can involve substantial risks of prejudice to a defendant's right to a fair trial.").

The court noted, however, that many of the potential harms from a dual jury procedure are also present and possibly magnified in a trial where the defendants are tried jointly. Like the Ninth Circuit in *Lambright*, the court stated that the use of a dual jury system may be "a reasonable response to prejudicial joinder, as it recognizes the court's interest in efficiency while mitigating the prejudice inherent in joint trials by diminishing the amount of inadmissible evidence a jury hears." *Id.*

The Government states that dual juries were employed successfully in this District in *United States v. Reed*, Case No. 2:08-cr-164 KJD-GWF.[1] The Government also states that dual juries were used in a trial before Judge George, but the Government has not yet been able to identify the specific case. The Government estimates that a joint trial in this case will take five to seven days. The Government states that it will present evidence and testimony relating solely to Defendant Williams at the end of its case-in-chief, so that the need to remove Defendant Branch's jury from the courtroom during the presentation of evidence can be minimized. In opposing the use of dual juries, Defendant cites problems similar to those noted by the Tenth Circuit in *Wilson v. Sirmons.* Defendant also points out that the courtrooms in this courthouse are not designed or equipped to conduct dual jury trials and that the members of one jury will have to sit in the courtroom gallery where they may overhear improper conversations from observers. *Defendant's Reply (#32)*, pg. 4.

---

[1] *United States v. Reed* involved four defendants. The court severed the trial as follows: Two defendants, Reed and Jackson, were tried together before separate juries. The other two defendants were tried together before one jury. The dual jury trial involving Reed and Jackson took five days to try. Jackson was convicted. A mistrial was declared as to Reed, who was subsequently convicted following a three day trial.

Defendant argues that the problems arising from dual juries outweigh the benefits to be gained by using that procedure. Defendant estimates that separate trials will each take approximately four days.

Before determining whether the use of dual juries is an advisable procedure for this case, the Court addresses Defendant's other arguments in support of severance.

## II.     Defendant's Other Arguments for Severance.

Defendant Branch argues that severance is also required because he and Defendant Williams have mutually exclusive or antagonistic defenses and, in particular, that Defendant Williams will attempt to gain acquittal by placing the blame for the alleged crimes on Branch. He also argues that he will be unfairly prejudiced in a joint trial because Defendant Williams is charged in the additional money laundering counts which increase Defendant Branch's risk of conviction even though he is not charged in those counts.

In *Zafiro v. United States*, 506 U.S. 537, 113 S.Ct. 933, 937 (1993), the Supreme Court stated that there is a preference in the federal system for joint trials because they promote efficiency and "'serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts.'" Joint trials are particularly appropriate in conspiracy cases because the evidence regarding the statements or acts of the other conspirators in furtherance of the conspiracy will be admissible against the defendant even if he is tried alone. *United States v. Cruz*, 127 F.3d 791, 799 (9th Cir. 1997); *United States v. Freeman*, 6 F.3d 586, 598 (9th Cir. 1993). *See also United States v. Sweeney*, 688 F.2d 1131, 1140 (7th Cir. 1981), quoting *United States v. Kahn*, 381 F.2d 824, (7th Cir. 1967) (stating that severance should not be granted in a conspiracy case "except for the most cogent reasons.").

In *United States v. Vasquez-Velasco*, 15 F.3d 833, 846 (9th Cir. 1994), the court stated that "[i]n assessing whether joinder was prejudicial, of foremost importance is whether the evidence as it relates to individual defendants is easily compartmentalized." (citation omitted.) "Central to this determination is the trial judge's diligence in instructing the jury on the purpose of the various types of evidence." *United States v. Fernandez*, 388 F.3d 1199, 1241 (9th Cir. 2004) cites four factors that courts should consider in determining the prejudicial effect of a joint trial, the most

important of which are whether the jury can be reasonably expected to collate and appraise the individual evidence against each defendant and whether the judge is diligent in instructing the jury on the limited purposes for which certain evidence may be used. *Vasquez-Velasco* stated that "[t]he most common reason for severing a trial is where codefendants present mutually exclusive or irreconcilable defenses." The court cited *United States v. Rucker*, 915 F.2d 1511, 1513 (11th Cir. 1990) in which the defendants each claimed ignorance of contraband found in a jointly occupied vehicle, such that the jury would be unable to believe the testimony of either defendant without disbelieving the codefendant's testimony. *Vasquez-Velasco* also stated that severance has been granted when the charges brought against the defendants or the weight of the evidence supporting each charge is wholly disparate or disproportionate. *Id.*

In *United States v. Tootick*, 952 F.2d 1078, 1080 (9th Cir. 1991), the court reversed defendants' convictions where they accused each other of having stabbed the victim. The court stated a defendant must meet a heavy burden to overturn a conviction based on the denial of a motion to sever. Merely showing that a comparative advantage would result from separate trials does not satisfy this burden. Likewise, mere inconsistency in defense positions is insufficient to find codefendants' defenses antagonistic. Rather, "[m]utually exclusive defenses are said to exist when acquittal of one codefendant would necessarily call for the conviction of the other." *Id.* at 1081. "The prototypical example is a trial in which each of two defendants claims innocence, seeking to prove instead that the other committed the crime." *Id.* The defendants in *Tootick* met that burden by showing that their respective defenses were based on attempting to prove that the other defendant committed the crime. The court stated that the defendants' attorneys acted as "unsanctioned prosecutors" during the trial. *Id.* at 1085. In reversing the convictions, the Ninth Circuit also cited the trial judge's failure to control the defendant's counsel's conduct or instruct the jury at appropriate times during the trial.

In *Zafiro v. United States*, 506 U.S. 534, 538-39, 113 S.Ct. 933, 937-38 (1993), the Supreme Court declined to adopt a "bright-line" rule mandating severance whenever codefendants have conflicting defenses. The court stated that mutually exclusive defenses are not prejudicial *per se.* The Court affirmed the defendants' convictions because acquittal of one or more of the

defendants on the drug possession charges did not necessarily require the jury to convict another defendant. In *United States v. Mayfield*, 189 F.3d 9895 (9th Cir. 1999), the Ninth Circuit distinguished *Zafiro* in holding that the defendant was prejudiced by the denial of severance. The two defendants in *Mayfield* were the only occupants of the residence in which narcotics were discovered during the execution of a search warrant. The evidence established that the narcotics belong to either one or both of the defendants. At trial, the co-defendant's counsel attempted to prove that Mayfield was the owner of the narcotics. The prejudice to Mayfield was also exacerbated by the introduction of inadmissible evidence by the co-defendant's counsel and by his repeated reference to that evidence during argument.

In *United States v. Voigt*, 89 F.3d 1050, 1094-95 (7th Cir. 1996), however, the Seventh Circuit stated that while mutually antagonistic defenses have been much discussed in theory, only rarely have courts found that they exist in practice. "Far more frequently, courts have concluded that the asserted defenses, while in conflict with one another, are not so irreconcilable that '[t]he jury could not have been able to assess the guilt or innocence of the defendants on an individual and independent basis.' *Tootick,* 952 F.2d at 1083." *Voigt* also noted that courts have consistently held that finger-pointing and blame-shifting among co-conspirators do not support a finding of mutually exclusive defenses. *Id.* at 1095, citing *United States v. Provenzano*, 688 F.2d 194, 198 (3rd Cir.), *cert. denied*, 459 U.S. 1071, 103 S.Ct. 492 (1982) and *United States v. Smith*, 44 F.3d 1259, 1266-67 (4th Cir. 1995).

The Fourth Circuit, in *United States v. Smith,* stated in this regard:

> Because joint participants in a scheme often will point the finger at each other to deflect guilt from themselves or will attempt to lessen the importance of their role, a certain amount of conflict among defendants is inherent in most multi-defendant trials. In order to justify a severance, however, joined defendants must show that the conflict is of such magnitude that "'the jury will unjustifiably infer that this conflict alone demonstrates that both are guilty.'" *United States v. Becker,* 585 F.2d 703, 707 (4th Cir. 1978) (citation omitted), *cert. denied,* 439 U.S. 1080, 99 S.Ct. 862, 59 L.Ed.2d 50 (1979) (quoting *United States v. Ehrlichman,* 546 F.2d 910, 929 (D.C.Cir. 1976), *cert. denied,* 429 U.S. 1120, 97 S.Ct. 1155, 51 L.Ed.2d 570 (1977)).

44 F.3d at 1266-67.

In *United States v. Sutherland*, 2011 WL 4007536, *3 (D.Nev. 2011), the district court upheld the magistrate judge's order denying the defendant's motion to sever her trial from the co-defendants in a mortgage fraud scheme in which defendants were charged with conspiracy to commit wire, mail and bank fraud. In so holding the court found that defendant's argument that her claim of innocence would require the jury to convict her co-defendants was not necessarily true and therefore did not require severance. In so holding, the court distinguished *Tootick* and cited the foregoing statements from *Voigt*.

Defendant Branch argues that Williams' statements to the FBI agents show that he intends to defend himself by placing the entire onus on Mr. Branch for the transaction. This includes Williams' alleged assertion to the FBI that (1) Branch initiated the plan for Williams to locate a purchaser in exchange for a $5,000 fee; (2) Branch knew the sellers; (3) Branch brought up the idea for the cash back payment from the buyers; (4) Branch drafted the purchase agreements; (5) Branch told Williams that the cash back payment would be made outside of escrow; (6) Branch advised Williams that the lender needed to see money in William Reed's bank account, which Branch deposited; (7) Branch dictated how to structure the payments after the closing; and (8) Branch threatened Williams because he did not receive his payment back from the deal. *Motion (#26)*, pgs. 10-11.

Whether Williams will actually testify at trial regarding the foregoing is unknown. According to his alleged statements to the FBI, Williams' principle defenses to Counts One and Two of the indictment are that he believed William Reed actually existed, that he did not create false documents regarding Reed and that he did not know a cash-back payment outside of escrow was illegal. These defenses, if believed, do not necessarily implicate Defendant Branch or result in his conviction. A reasonable doubt as to whether Mr. Reed actually existed could also benefit Mr. Branch's defense. Mr. Williams' alleged lack of knowledge that a cash back transaction was illegal does not establish that Mr. Branch knew it was illegal. The Defendants' defenses are, therefore, not so mutually exclusive or antagonistic as to require severance. Likewise, the money laundering counts against Defendant Williams are sufficiently distinct from the charges against Branch that the jury, with the aid of appropriate instructions, should be able to compartmentalize the evidence

relating to those charges and separate them from its consideration of the evidence against Defendant Branch on the conspiracy and bank fraud counts. Severance is therefore not warranted on the basis of these arguments.

## CONCLUSION

This brings the Court back to the question of whether separate trials should be granted or a joint trial should be conducted with two juries. A dual jury trial would adequately protect Defendant Branch's Sixth Amendment rights under *Bruton*. Although Defendant Branch's other arguments do not require separate trials, the granting of completely separate trials would also guard against whatever prejudice might result from either defendant's attempt to cast the blame on the other. The District Judge, who must ultimately supervise and manage a dual jury trial, is better able than the undersigned magistrate judge to assess the burdens and efficiencies of conducting a dual jury trial in this case versus ordering separate trials for the Defendants. Accordingly,

**IT IS HEREBY ORDERED** that Defendant Eric Sheva Mantel Branch's Sealed Motion to Sever (#26) is **granted** as follows:

In order to protect Defendant Branch's Sixth Amendment rights pursuant to *Bruton v. United States*, the Court should impanel two juries, one for each Defendant, so that evidence admissible only as to one Defendant is not presented to the jury assigned to the other Defendant. Alternatively, the Court should grant separate trials to the Defendants if the District Judge determines that the logistical problems and burdens of conducting and supervising a dual jury trial outweigh the benefits of that procedure over separate trials for the Defendants.

DATED this 4th day of April, 2013.

_____
GEORGE FOLEY, JR.
United States Magistrate Judge